UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
ALEX PABON, et al.,

                Plaintiffs,

    –against–                                   14-cv-7897 (LAK)

BARCLAYS BANK PLC, et ano.,

                Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OPINION

Appearances:

        Anne C. Vladeck
        Anne L. Clark
        Allison Lindsey Van Kampen
        VLADECK, WALDMAN, ELIAS & ENGELHARD, P.C.
        *Attorneys for Plaintiffs*

        David H. Braff
        Jeffrey T. Scott
        Matthew J. Porpora
        SULLIVAN & CROMWELL LLP

        Leigh M. Nathanson
        Michael Brille
        BOIES, SCHILLER & FLEXNER LLP

        *Attorneys for Defendants*

LEWIS A. KAPLAN, *District Judge*.

        Plaintiffs move to compel defendants to produce documents that Barclays previously produced to regulators in what the parties have termed the Global Investigation, which related to fixing and manipulation of the London Interbank Offered Rate ("LIBOR"), for 21 custodians for the

period beginning January 1, 2005 and ending May 31, 2009 (the "Previously Produced Documents").[1] They seek also an order requiring Barclays to furnish lists of Barclays employees who were (1) interviewed by regulators in connection with LIBOR or (2) criminally charged (whether or not for LIBOR-related offences), in each case for whom Barclays has paid legal fees ("ILA Funding"). Barclays resists. But it is useful before proceeding to the details to understand the basic determinants of the parties' positions.

*Background*

*The Plaintiffs and Their Claims*

The plaintiffs formerly were swaps traders employed by Barclays. They have been indicted, and now are on trial, in the United Kingdom for alleged manipulation of the U.S. Dollar LIBOR. The charge appears to be that they requested Barclays USD LIBOR submitters to alter Barclays submissions during the period June 2005 through August 2007 and on some later occasions into 2009 to benefit Barclays' trading positions for which they were responsible.[2] They here seek a determination that Barclays is obliged to continue paying or, at least, to advance their legal fees.

---

[1] Barclays previously produced to plaintiffs documents from 16 of these custodians from a narrower time period. Barclays has not produced any documents from the five remaining custodians (the "Five"). *See* DI 46, at 1 n.3.

[2] By referring to these as Barclays' trading positions, the Court does not mean to suggest that the plaintiff traders, assuming *arguendo* that they engaged in the alleged conduct, acted selflessly in the sole interest of their employer. Given the incentive compensation arrangements typical in the financial services industry, the Court assumes without deciding that self interest, as well as employer interest, was a motivating factor in any such behavior.

The positions at various times would have benefitted from rates higher, lower or no different than otherwise would have been determined.

3

This Court previously denied Barclays' motion to dismiss the complaint. It then observed in part that Barclays obligations, if any, could depend upon what is "fair and reasonable" and that what is "fair and reasonable" might be informed by the extent, if any, to which "Barclays was complicit at high levels with any misconduct committed by the plaintiffs."[3]

*The Global Investigation*

The scandal concerning alleged misconduct with respect to LIBOR fixings was not limited to the alleged efforts of plaintiffs and others to benefit Barclays' trading positions. The Global Investigation addressed a broad time period that included the global financial crisis (roughly August 2007 through January 2009), as well as earlier events. It focused on substantive concerns beyond trading conduct of the sort of which plaintiffs stand accused.

In the end, Barclays entered into a non-prosecution agreement with the U.S. Department of Justice (the "NPA")[4] and settlements with the Commodity Futures Trading Commission (the "CFTC")[5] and the UK's then Financial Services Authority. These arrangements resolved what Barclays describes as "those authorities' investigations into Barclays LIBOR and other

---

[3] DI 24, ¶ 3.

[4] Letter from Denis McInerney, Chief, Criminal Division, Fraud Section, U.S. Dep't of Justice, to Steven R. Peiken et al. & App. A (June 26, 2012), *available at* https://www.justice.gov/iso/opa/resources/337201271017335469822.pdf, and https://www.justice.gov/iso/opa/resources/931201271017342636 5941.pdf, respectively (both last visited May 11, 2016).

[5] Order Instituting Proceedings, Etc., CFTC Docket No. 12-25, at 29-30, ¶¶ VI.C.2, VI.E.1 (June 27, 2012), *available at* http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfbarclaysorder062712.pdf (last visited May 11, 2016).

4

rate submission practices."[6]

The NPA and the CFTC settlement contain statements of facts or findings. It is relevant to note, however, that Barclays consented to those statements and findings. None was the result of a contested proceeding. And it does not disrespect the distinguished public bodies concerned to observe that findings in those circumstances are at least somewhat different than findings made by a court or other adjudicative officer or tribunal with the benefit of adversarial testing.

*Barclays' Present Position*

Barclays in substance here invites the Court to accept its division of its now conceded misconduct into two neat segments. The first would consist only of the alleged attempts by Barclays swaps traders to influence the bank's LIBOR submissions to contribute to rate fixings that would have benefitted Barclays' trading positions, efforts that variously sought higher, lower or unchanged LIBOR fixings. The second segment would consist only of Barclays' submission during the financial crisis of artificially low rates in an effort to create the impression of greater financial strength on its part than was warranted. Thus, Barclays seeks to avoid disclosure of Previously Produced Documents that come from the (1) 21 non-plaintiff custodians for the post-indictment period, and (2) the Five for the indictment period. Such disclosure, it argues, "cannot possibly explain *Plaintiffs'* conduct, or the motivation for it, *during* the Indictment Period."[6] This is so, it

---

[6] DI 50, at 2.

[6] *Id.* (emphases in original). The U.K. "Indictment Period" runs from June 2005 through August 2007.

5

contends, because the requested discovery for the Five has "*nothing to do* with the . . . [c]onduct for which Plaintiffs have been criminally charged," and the requested post-indictment discovery is "relevant only to an entirely different, unrelated course of conduct" that occurred in the financial crisis period.[7]

Barclays' response to the request for ILA Funding information is that it has responded to the request "as to those matters [that it regards as] sufficiently related in time and origin to Plaintiffs' indictment as to be potentially relevant."[8]

*Discussion*

*Document Requests*

Barclays' arguments are wide of the mark at this early stage of the litigation, however persuasive they might prove in a closing argument to a trier of fact at the close of trial. While it is unnecessary to ring all the changes on its contentions, several points are worthy of note.

As an initial matter, the premise of Barclays' argument is that there was no relevant relationship between the circumstances in which (a) the plaintiff swaps traders allegedly sought to manipulate Barclays' LIBOR submissions to benefit the bank's trading positions, and (b) other bank employees worked to secure artificially low LIBOR submissions. At least for the present, that premise is little more than an assertion or assumption. In each case, the alleged misconduct, if it occurred, was undertaken at least in part to benefit the economic position of the bank. In each case, it presumably would have been motivated too by a desire to serve the personal economic interests

---

[7] *Id.* at 3.

[8] *Id.*

of the bank employees involved, which presumably were related in some way to the performance of Barclays. While the alleged misconduct, if it occurred, may have been separated to a large degree in time and involved mainly different people, the overall outlines were not necessarily as distinct as Barclays assets. And if Barclays in both circumstances was complicit at a relevant level with both types of alleged misconduct, that fact reasonably might bear significantly on the fairness and reasonableness of requiring the bank to stand behind these plaintiffs to the extent of advancing legal expenses and, depending upon all the circumstances, perhaps indemnifying them.

Second, Barclays places undue reliance on the "findings" of the regulators reflected in the NPA and the CFTC settlement. As noted, none of those findings was made after adversarial litigation. Indeed, the vacuity of Barclays' position in this respect is well illustrated by comparison to the rules that govern issue preclusion. In order for the doctrine of issue preclusion to apply, four requirements must be satisfied:

> "'(1) the issues in both proceedings must be identical (2) the issue in the prior proceeding must have been actually litigated and actually decided, (3) there must have been a full and fair opportunity for litigation in the prior proceeding, and (4) the issue previously litigated must have been necessary to support a final judgment on the merits.'"[9]

The suggestion that this Court should take as conclusive, even for the present limited purpose, findings of the sort relied upon here – "findings" as to matters that were not actually litigated, in many cases not necessary to support the previous results, and not matters that the plaintiffs in this case were in a position to have litigated previously – is unpersuasive.[10]

---

[9] *ICD Holdings S.A. v. Frankel,* 976 F. Supp. 234, 239 (S.D.N.Y. 1997) (quoting *Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 (2d Cir. 1986)).

[10] Barclays' assertion that "other courts have consistently determined that the Financial Crisis Period Conduct is distinct from Trader Conduct" [DI 50, at 3] also is misguided. It cites for

Third, Barclays argues that the time period alleged in the U.K. indictment – June 2005 through August 2007 – supports its assertion that there was no overlap between the alleged trading misconduct charged there and the bank's admitted misconduct during the financial crisis. The argument is not nearly as strong as Barclays would have it.

The standard of proof in a criminal case in the United Kingdom is no different than our own. "[I]t is for the prosecution to prove the charge, or charges, and to prove them so that you [i.e., the jurors] are sure that they have been made out—to prove them beyond a reasonable doubt."[11] The indictment in the U.K. prosecution therefore cannot be taken as establishing that the British prosecutors regarded the plaintiffs' alleged misconduct as confined entirely or even principally to the June 2005 to August 2007 period. That may be so. But another possibility is that the prosecutors felt the Crown could prove guilt beyond a reasonable doubt only with respect to the period alleged in the indictment. Certainly this Court cannot properly accept either hypothesis as

---

that proposition Judge Buchwald's ruling in *In re LIBOR-Based Fin. Instruments Antitrust Litig.,* No. 11 MDL 2262 (NRB), 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015), and *Galope v. Deutsche Bank Nat'l Trust Co.,* 2015 U.S. Dist. LEXIS 33637 (C.D. Cal. Jan. 12, 2015). But Judge Buchwald's opinion in relevant part addressed motions to dismiss complaints for alleged legal insufficiency. It thus assumed for purposes of those motions the truth of plaintiffs' allegations and decided no factual issues. *Galope*, for its part, came on a motion for summary judgment dismissing the complaint for lack of antitrust standing and thus did nothing more with respect to time periods than recite as background statements contained in the negotiated settlements, which were extraneous to the issues before the Court. Barclays was not well advised to characterize either case as having "determined" the correctness of the assertions on which it now relies.

[11] *R. v. Ching (Yap Chuan),* [1976] 63 Cr. App. R. 7, 8 (C.A.); *accord Woolmington v. Director of Public Prosecutions,* [1935] A.C. 462, 481 (H.L.) ("Throughout the web of the English Criminal Law one golden thread is always to be seen, that it is the duty of the prosecution to prove the prisoner's guilt . . . . If, at the end of and on the whole of the case, there is a reasonable doubt, created by the evidence given by either the prosecution or the prisoner, as to whether the prisoner killed the deceased with a malicious intention, the prosecution has not made out the case and the prisoner is entitled to an acquittal.") (per Sankey, L.C.).

8

a given in the entire absence of any evidence.

To be sure, the additional document discovery sought by plaintiffs may prove to be of little or no help to them. Moreover, the Court is entirely mindful of the need for proportionality in discovery. In the last analysis, however, we are concerned here only with documents from twenty-one custodians that Barclays already has gathered and turned over to regulators. While the value of these materials to the plaintiffs may turn out to be small, that cannot be assumed. And the burden on Barclays, if there would be any at all, would be minimal.

*ILA Funding*

The question whether advancement and indemnification would be fair and reasonable depends on all relevant circumstances. Its determination likely will be informed by what Barclays has done in other cases.[12] Whether any advancement and indemnification paid in other circumstances proves germane is a matter for subsequent consideration in view of the similarities and differences between any such cases and this one. With due respect, it perhaps is presumptuous for Barclays to insist that it, rather than the Court, be the ultimate judge of what is relevant to plaintiffs' case.

---

[12] *See, e.g.*, *United States v. Stein*, 541 F. 3d, 140-41, 143-44 (2d Cir. 2008).

9

*Conclusion*

I have considered all of Barclays' arguments.

Plaintiffs' letter motion [DI 46] of March 21, 2016 is granted in all respects.

SO ORDERED.

Dated:     May 12, 2016

                                              Lewis A. Kaplan
                                      United States District Judge